23-04785MB

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

Your Affiant, Nathaniel Forthun, being first duly sworn, hereby deposes and states as follows:

**I.      INTRODUCTION AND AGENT BACKGROUND**

1. I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to examine two cellular telephones described more particularly in Attachment A (hereafter "TARGET DEVICE 1" and "Target DEVICE 2"), and to extract the electronically stored information set forth in Attachment B, which represents evidence and/or instrumentalities of the criminal violations further described below. TARGET DEVICE 1 is a purple iPhone with phone number (520) 822-6182 seized from Daniella DE LA CRUZ. TARGET DEVICE 2 is a silver iPhone with phone number (520) 664-4228 seized from Marissa DURAN.

2. The purpose of this application is to seize evidence, more particularly described in Attachment B of this search warrant application, of violations of 8 U.S.C. § 1324, alien smuggling, and 18 U.S.C. § 1956, money laundering.

3. I am a Special Agent with Homeland Security Investigations. I have been in this position since December 2018. During this time, I have specialized in human smuggling investigations and have conducted and assisted with investigations involving human smuggling, human trafficking, weapons offenses, sex offenses, narcotic offenses, violent crimes, child exploitation, and immigration violations.

4. Prior to becoming a special agent with HSI, I was employed by Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) as a deportation officer (DO) from July 2016 to December 2018, and by the United States Border Patrol (USBP) as a patrol agent (BPA) from August 2013 to July 2016. As a DO, I interviewed illegal and criminal aliens to identify immigration and criminal violations,

arrested illegal aliens, and managed many types of casework relating to immigration proceedings. I also served as an intelligence officer while a DO at ICE ERO, tasked with interviewing illegal aliens to obtain information regarding smuggling organizations and transnational gangs. As a BPA, I was assigned to the Weslaco Border Patrol Station, Rio Grande Valley Sector, as a patrol agent and a collateral intelligence agent. As a patrol agent, I conducted enforcement operations to deter, interdict, and seize individuals and contraband seeking to enter, or which had previously entered the United States in violation of U.S. immigration laws and customs regulations. While assigned as a collateral intelligence agent, I conducted intelligence interviews with criminal and illegal aliens and assisted in the investigation of human and narcotics smugglers, gaining experience and knowledge of the operational techniques of these organizations.

5. I have attended and completed the Basic Course for Border Patrol Agents, the Criminal Investigator Training Program, and the HSI Special Agent Training Program at the Federal Law Enforcement Training Centers in Artesia, New Mexico and Glynco, Georgia. I have a Bachelor of the Arts in Criminal Justice from Thomas Edison State College. I have received and continue to receive specialized training in constitutional criminal procedure, drug identification and recognition, interview and interrogation techniques, search and seizure, evidence collection, surveillance operations, and standard operating procedures pertaining to various transnational criminal organizations. I received this knowledge from training courses, other law enforcement officers/agents conducting human and narcotics smuggling investigations, as well as from criminal defendants and suspects.

6. Throughout my career, I have performed various tasks which include, but are not limited to: (a) functioning as a case agent, which entails the management of investigations in several investigative program areas to include human smuggling, human trafficking, narcotics smuggling, violent crimes, financial crimes, and immigration

violations; (b) conducting research in both open source and law enforcement sensitive databases and applications on individuals suspected to be involved in criminal activity; (c) performing physical surveillance and thereby observing and recording movements of persons suspected of various criminal activities; (d) interviewing witnesses and cooperating individuals, and (e) testifying before Grand Juries; and (f) swearing to and executing search and arrest warrants.

7. The statements contained in this Affidavit are based on information derived from your Affiant's personal knowledge, training and experience; information obtained from the knowledge and observations of other sworn law enforcement officers, either directly or indirectly through their reports or affidavits; surveillance conducted by law enforcement officers; and analysis of social media and Google Drive information.

8. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, your Affiant has not set forth all of the relevant facts known to law enforcement officers.

## II.  BASIS FOR PROBABLE CAUSE

9. Homeland Security Investigations (HSI) and Internal Revenue Service-Criminal Investigations (IRS-CI) have been investigating Alonzo DE LA CRUZ (A. DLC) and ultimately Daniella DE LA CRUZ (D. DLC) and several members of their extended family (Bertha CAZARES [D. DLC's mother, hereafter CAZARES] and Marissa DURAN [D. DLC's sister, hereafter DURAN]) for human smuggling and/or money laundering since approximately March 2020.

10. On May 28, 2020, A. DLC and D. DLC' phone calls were intercepted pursuant to a Title III wiretap authorized by the United States District Court for Arizona. They were making arrangements to pick up persons believed to be illegal aliens. A. DLC

was intercepted telling a co-conspirator that a person (understood to be an illegal alien) named "Rudy" would be picked up at mile marker 102 on Highway 86 and provided a description of the vehicle which would pick up the alien. United States Border Patrol stopped a vehicle matching the description of the pickup vehicle, and A. DLC received a picture via text believed to be from this vehicle stop. After the vehicle stop, USBP located three aliens (including one named "Rudy") at/near mile marker 102 on Highway 86.

11. On August 2, 2020, A. DLC was intercepted communicating with a co-conspirator regarding transporting individuals believed to be illegal aliens near Three Points, Arizona. Through interceptions, it was determined that a co-conspirator was coordinating with a female driver to transport the illegal aliens and that D. DLC was assisting with transporting and possibly scouting. BPAs observed a suspicious vehicle being driven by Isabel PARGAS which resulted in her arrest for alien smuggling of two illegal aliens.

12. From May 2020 through July 2020, HSI intercepted DURAN speaking with A. DLC on multiple occasions regarding what I believe to be human smuggling based on my training and experience.

13. IRS-CI conducted analysis of financial records and activity which revealed several bank accounts that contained funnel activity which were used by A. DLC, D. DLC, CAZARES, and DURAN to issue payments to drivers and facilitators, consistent with the method this organization utilized to move funds. Funnel accounts are individual or business accounts in one geographic area that receive multiple cash deposits, often in amounts below the cash reporting threshold, and from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.

14. Due to recent cash deposit restrictions put in place by financial institutions, the recent out of state deposits were mostly conducted using wire transfers, personal or cashier's checks, and money orders. Some of the checks and money orders used as

payment were sent to Arizona and deposited locally. The DE LA CRUZ family also utilized Money Service Businesses (MSBs) such as MoneyGram, Western Union, Ria, etc. and Peer to Peer (P2P) services such as Venmo, Zelle, Facebook, etc. to facilitate the interstate movement of cash and avoid detection.

15. Dozens of funnel account and MSB transactions were identified and analyzed in connection with A. DLC, D. DLC, CAZARES, DURAN, and co-conspirators, showing approximately $1,370,052 in specified unlawful activity (SUA) proceeds, in violation of Title 18 U.S.C. § 1324, transportation and harboring of illegal aliens. These proceeds flowed through financial institutions from at least 2017 to 2023. A. DLC, D. DLC, and co-conspirators promoted the SUA through the receipt, and payments to co-conspirators, of smuggling fees, and concealed the nature, source, and ownership of SUA proceeds through the use of nominees, including family and friends, to receive smuggling fees, in violation of Title 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i), and Title 18 U.S.C. § 1956(h), money laundering conspiracy.

16. On August 23, 2023, a Grand Jury in the United States District Court, District of Arizona issued a true bill of indictment for D. DLC, CAZARES, DURAN, and co-conspirator Jaime PALLANES for human smuggling and/or money laundering. HSI and IRS-CI could not seek the indictment of A. DLC as a co-conspirator with D. DLC, CAZARES, and DURAN because A. DLC was killed in an automobile accident in June 2023.

17. On October 17, 2023, HSI and IRS-CI executed arrest warrants for D. DLC, CAZARES, and DURAN in Three Points, Arizona. During the arrests, agents detained and later seized TARGET DEVICE 1 from D. DLC and TARGET DEVICE 2 from DURAN.

18. On October 17, 2023, CAZARES gave agents permission to search her phone. On this phone, agents found a WhatsApp group chat between Guera (using

WhatsApp # 15203107099), Marissa Cazares (aka DURAN, using WhatsApp # 15206644228), D. DLC (using WhatsApp # 15208226182), NanaB (understood to be Bertha CAZARES, using WhatsApp # 15205014390), and Angel Hidalgo (using WhatsApp # 15203361689) appearing to discuss smuggling undocumented immigrants on September 29, 2022. The portions relating to human smuggling were between D. DLC (whose WhatsApp number listed above is the same as the phone number for TARGET DEVICE 1) and DURAN (whose WhatsApp number above is the same as the phone number for TARGET DEVICE 2).[1] No other members of the group chat were participating/sending messages in the chat during the portion of the conversation described below. The below portion of the conversation occurred in an approximately ten minute time span.

19.     During this conversation, D. DLC asked DURAN if DURAN had a driver available and said D. DLC had "4" but no driver. DURAN gave D. DLC a name for a potential driver and said this driver had been waiting for work. D. DLC asked DURAN how much DURAN paid the driver and DURAN stated "300 each[.]" D. DLC asked about availability of the driver and DURAN replied "I have two at dads but max is taking them later" and that DURAN thought the driver was currently available. DURAN shared a contact number for the driver, informed D. DLC the driver said he was ready, and for D. DLC to call the driver. Based on my training and experience, I believe this conversation is discussing human smuggling.

20.     On November 30, 2023, I interviewed Jaime PALLANES (PALLANES) subsequent to his arrest pursuant to a federal arrest warrant. PALLANES was a co-conspirator in this investigation who was indicted with D. DLC, DURAN, and CAZARES. In a post-Miranda statement, PALLANES stated that DURAN was actively

---

[1] The WhatsApp numbers for D. DLC and DURAN were the same (respectively) as the phone numbers for TARGET DEVICE 1 and TARGET DEVICE 2 with the addition of the "1" prefix or United States country code.

6

involved in human smuggling, that D. DLC was involved in this business, and that D. DLC had offered PALLANES work smuggling illegal aliens in August 2023.

21. In summary, I observed a conversation between D. DLC and DURAN discussing what I believe, based on my training and experience, to be human smuggling using a group WhatsApp chat. The WhatsApp numbers used by D. DLC and DURAN are respectively the same (with the addition of the "1" prefix or US country code) as the current phone numbers of TARGET DEVICE 1 and TARGET DEVICE 2. TARGET DEVICE 1 was located in the vehicle D. DLC was driving when arrested and D. DLC indicated this phone belonged to her. TARGET DEVICE 2 was located in the vehicle DURAN was driving when she was arrested and DURAN indicated this phone belonged to her. Based on my training and experience, I known that it is extremely common for individuals to use their device's phone number as their WhatsApp number and for human smugglers to use WhatsApp to communicate about human smuggling and to provide instructions and directions during human smuggling attempts. Additionally, a historic co-conspirator of D. DLC and DURAN stated they were currently or recently involved in human smuggling.

22. The TARGET DEVICE 1 and TARGET DEVICE 2 are currently in storage at the Sells, Arizona HSI evidence vault. In my training and experience, I know that the TARGET DEVICE has been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICE first came into the possession of HSI.

### III. ITEMS TO BE SEIZED

23. Based upon the facts contained in this Affidavit, your Affiant submits there is probable cause to believe that the items listed in Attachment B will be found in the contents of the TARGET DEVICE 1 and TARGET DEVICE 2.

24. Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information, your Affiant knows the following:

a. Individuals engaging in human smuggling or money laundering commonly use cellular telephones to communicate with other conspirators and customers about criminal activities through the use of telephone calls, text messages, email, chat rooms, social media, and other internet- and application-based communication forums. Moreover, individuals engaging in human smuggling or money laundering commonly use other capabilities of cellular telephones to further their smuggling activities. Therefore, evidence related to human smuggling and money laundering is likely to be found on the TARGET DEVICE 1 and TARGET DEVICE 2.

b. Individuals engaging in human smuggling and/or money laundering often have access to large amounts of currency in order to maintain and finance their ongoing criminal activities. Therefore, records of the movement of proceeds, including deposits, transfers, and purchases, are likely to be found on the TARGET DEVICE 1 and TARGET DEVICE 2.

25. In addition to items which may constitute evidence and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the TARGET DEVICE 1 and TARGET DEVICE 2.

**IV.    DIGITAL EVIDENCE STORED WITHIN A CELLULAR TELEPHONE**

26. As described in Attachment B, this application seeks permission to search for records and information that might be found in the contents of the TARGET DEVICE 1 and TARGET DEVICE 2. Thus, the warrant applied for would authorize the copying of electronically stored information under Rule 41(e)(2)(B).

27. *Probable cause.* Your Affiant submits that there is probable cause to believe records and information relevant to the criminal violations set forth in this Affidavit will be stored on TARGET DEVICE 1 and TARGET DEVICE 2 for at least the following reasons:

a. Your Affiant knows that when an individual uses a cellular telephone, the cellular telephone may serve both as an instrumentality for committing the crime and also as a storage medium for evidence of the crime. The cellular telephone is an instrumentality of the crime because it is used as a means of committing the criminal offense. The cellular telephone is also likely to be a storage medium for evidence of crime. From my training and experience, your Affiant believes that a cellular telephone used to commit a crime of this type may contain: data that is evidence of how the cellular telephone was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

b. Based on my knowledge, training, and experience, your Affiant knows that cellular telephones contain electronically stored data, including, but not limited to, records related to communications made to or from the cellular telephone, such as the associated telephone numbers or account identifiers, the dates and times of the communications, and the content of stored text messages, e-mails, and other communications; names and telephone numbers stored in electronic "address books;" photographs, videos, and audio files; stored dates, appointments, and other information on personal calendars; notes, documents, or text files; information that has been accessed and downloaded from the Internet; and global positioning system ("GPS") information.

c. Based on my knowledge, training, and experience, your Affiant knows that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a cellular telephone, deleted, or viewed via the

9

Internet. Electronic files downloaded to a cellular telephone can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a cellular telephone, the data contained in the file does not actually disappear; rather, that data remains on the cellular telephone until it is overwritten by new data.

d. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the cellular telephone that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a cellular telephone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how the cellular telephone was used, the purpose of the use, who used it, and when. There is probable cause to believe that this forensic electronic evidence will be found in the contents of the TARGET DEVICE 1 and TARGET DEVICE 2 because:

a. Data in a cellular telephone can provide evidence of a file that was once in the contents of the cellular telephone but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. As explained herein, information stored within a cellular telephone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within electronic storage medium (e.g., registry information, communications, images and movies, transactional information, records of

10

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the cellular telephone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the cellular telephone was remotely accessed, thus inculpating or exculpating the owner. Further, activity on a cellular telephone can indicate how and when the cellular telephone was accessed or used. For example, as described herein, cellular telephones can contain information that log: session times and durations, activity associated with user accounts, electronic storage media that connected with the cellular telephone, and the IP addresses through which the cellular telephone accessed networks and the internet. Such information allows investigators to understand the chronological context of cellular telephone access, use, and events relating to the crime under investigation. Additionally, some information stored within a cellular telephone may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a cellular telephone may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The geographic and timeline information described herein may either inculpate or exculpate the user of the cellular telephone. Last, information stored within a cellular telephone may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information within a computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

        c.     A person with appropriate familiarity with how a cellular telephone works can, after examining this forensic evidence in its proper context, draw conclusions about how the cellular telephone was used, the purpose of its use, who used it, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a cellular telephone that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, cellular telephone evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on one cellular telephone is evidence may depend on other information stored on that or other storage media and the application of knowledge about how electronic storage media behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

        e.     Further, in finding evidence of how a cellular telephone was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

29.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant your Affiant is applying for would permit imaging or otherwise copying the contents of the TARGET DEVICE 1 and TARGET DEVICE 2, including the use of computer-assisted scans.

30.    *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V. CONCLUSION

31. Your Affiant submits there is probable cause to believe that the items listed in Attachment B, which constitute evidence and/or instrumentalities of violations of 8 U.S.C. § 1324 – alien smuggling, and 18 U.S.C. § 1956 – money laundering are likely to be found in the contents of TARGET DEVICE 1 and TARGET DEVICE 2 as further described in Attachment A.

NATHANIEL M FORTHUN
Digitally signed by NATHANIEL M FORTHUN
Date: 2023.12.14 08:51:03 -07'00'

Nathaniel Forthun
Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically this 14th day of December, 2023.

Maria S. Aguilera
United States Magistrate Judge

13